## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **LYNETTE WOODARD**,<br><br>        Plaintiff,<br><br>v.<br><br>**UNDRCRWN, LLC**, a New York Limited Liability Company;<br><br>**HERSCHEND ENTERTAINMENT COMPANY, LLC**, a Missouri Limited Liability Company;<br><br>**HERSCHEND FAMILY ENTERTAINMENT CORPORATION**, a Missouri General Business for Profit Corporation;<br><br>**HARLEM GLOBETROTTERS INTERNATIONAL, INC**., a Nevada For Profit Corporation with its principal place of business in Peachtree Corners, Georgia,<br><br>        Defendants. | Case No. 1:25-05415<br><br>Jury Trial Requested |

## **COMPLAINT**

Plaintiff Lynette Woodard sues Defendants UNDRCRWN, LLC ("UNDRCRWN"),

Herschend Entertainment Company, LLC ("Herschend Entertainment"), Herschend Family

Entertainment Corporation, LLC ("Herschend Family"), and Harlem Globetrotters International,

Inc. ("HGI") (collectively, "Defendants"), and alleges as follows:

### **Parties**

1.      Plaintiff Lynette Woodard is an individual and resides in Lawrence, Kansas.

2.      Defendant UNDRCRWN, LLC ("UNDRCRWN") is a New York Limited

Liability Company with its headquarters located at 64 Beaver Street, Suite 240, New York, NY

10004. UNDRCRWN is reportedly a streetwear brand specializing in clothing that is inspired by sports lifestyle. According to its Articles of Incorporation of UNDRCWN, LLC, it was organized solely by Scott J. Schuster who is a citizen of Albany, New York. After a good faith investigation, it is believed that none of the members of the LLC reside in Georgia, Kansas, or Missouri.

3.      Defendant Herschend Entertainment Company, LLC ("Herschend Entertainment") is a Missouri Limited Liability Company with its principal place of business located in Springfield, Missouri. According to its Articles of Incorporation of Herschend Entertainment Company, LLC, it was organized solely by Stephen L. Earnest who is a citizen of Norcross, Georgia. After a good faith investigation, it is believed that none of the members of the LLC reside in Kansas.

4.      Defendant Herschend Family Entertainment Corporation ("Herschend Family") is a Missouri General Business for Profit Corporation with its principal place of business located in Branson, Missouri.

5.      Defendant Harlem Globetrotters International, Inc. ("HGI") is a Nevada for Profit Corporation with its principal place of business in Peachtree Corners, Georgia.

6.      Upon information and belief based upon a good faith investigation, HGI is owned by Defendant Herschend Family Entertainment. *See* Harlem Globetrotters, About ("On Oct.1, 2013, the Globetrotters were purchased by Herschend Family Entertainment, the largest family-owned themed attractions company in the U.S., marking an expansion for the company into new media, audiences and markets."), *available at* https://www.harlemglobetrotters.com/about (last visited Mar. 27, 2025).

7.      By its own account, "Herschend's portfolio of more than two dozen wholesome family entertainment brands includes iconic award-winning destinations such as Dollywood® Parks & Resorts, Silver Dollar City® Company, Adventure Aquarium®, Callaway Resort & Gardens®, Kentucky Kingdom®, Newport Aquarium®, The Vancouver Aquarium® and Wild Adventures®. In addition to its premier themed attractions, Herschend is proud to steward the World-Famous Harlem Globetrotters® legacy and provide immersive content and experiences through our Herschend Entertainment Studios® and Pink Adventure Tours® brands." *See* Herschend, About Us, *available at* https://www.hfecorp.com/about-us/ (last visited Mar. 27, 2025). Herschend touts that it conducts its business "in a Manner Consistent with Christian Values and Ethics." *Id*.

### Jurisdiction & Venue

8.      This action arises under the Lanham Trademark Act of 1946, 15 U.S.C. § 1051, *et seq.* (the "Lanham Act"), and various statutory and common claims under the law of the states of New York and California.

9.      This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and the law of supplemental jurisdiction under 28 U.S.C. § 1367.

10.     This Court also has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332 because (a) complete diversity of citizenship exists between Plaintiff and Defendants; and (b) the amount in controversy exceeds $75,000, exclusive of costs, interest, and attorneys' fees.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

## Factual Background

I.    **Ms. Woodard's Fame and Notoriety.**

12.    Ms. Woodard is widely considered one of the greatest basketball players of all time.

13.    Ms. Woodard was four-time Kodak All-American at the University of Kansas.

14.    Ms. Woodard is a two-time Olympian and was Captain of the gold-medal-winning 1984 United States Olympic team.

15.    Ms. Woodard played basketball professionally in Europe, Japan, and America.

16.    Ms. Woodard is a historic trailblazer. She became the first woman to ever play for a men's professional basketball team when she signed with the Harlem Globetrotters in October 1985.

17.    Ms. Woodard "set the tone for women wanting to be Globetrotters. Since her debut nearly 40 years ago, 19 women have put on the Globetrotters uniform and dazzled crowds throughout the world." Shakeia Taylor, *Women of the Globetrotters: Lynette Woodard set the tone, others fuel the legacy*, THE ATHLETIC, (Feb. 16, 2025), *available at* https://www.nytimes.com/athletic/6114095/2025/02/13/harlem-globetrotters-lynette-woodard-basketball-tnt-torch/ (last visited May 6, 2025).

18.    Ms. Woodard toured around the world with the Globetrotters for two years.

19.    In 1996, Ms. Woodard was presented with a Harlem Globetrotters "Legends" Ring.

20.    Ms. Woodard also played in the inaugural season of the WNBA for the Cleveland Rockers in 1997 and was selected by the Detroit Shock in the 1998 WNBA expansion draft.

21.    Ms. Woodard was inducted into the Naismith Basketball Hall of Fame in 2004.

22.     Ms. Woodard has also been inducted into the National High School Hall of Fame, the Women's Sports Hall of Fame, the Black Legends Professional Hall of Fame, the State of Kansas Hall of Fame, and the African American Hall of Fame.

23.     Ms. Woodard's "was a trendsetter almost 40 years ago, an icon today and a great story that will never be forgotten in Globetrotters history." Shakeia Taylor, *Women of the Globetrotters: Lynette Woodard set the tone, others fuel the legacy*, THE ATHLETIC, (Feb. 16, 2025), *available at* https://www.nytimes. com/athletic/6114095/2025/02/13/harlem-globetrotters-lynette-woodard-basketball-tnt-torch/ (last visited May 6, 2025).

## II.     Ms. Woodard's Contract with the Harlem Globetrotters, and the Associated Collective Bargaining Agreement.

### A.     Player Contract

24.     Following an intense try-out period, and to significant fanfare, Ms. Woodard signed her first contract with the Harlem Globetrotters in October 1985 ("1985 Contract"), becoming the first female player to play in the men's league. *Id.*

25.     Under the terms of the 1985 Contract, Ms. Woodward was to be paid a salary of only $75,000 for her first year and $100,000 for her second year. A true and correct copy of the 1985 Contract is attached hereto as **Exhibit A**.

26.     This contract covers the 1985-86 and 1986-87 basketball seasons. *Id*.

27.     During the term of this contract, a dispute arose between Ms. Woodard and the Globetrotters because the Company was not properly compensating her during the 1985-86 regular season.

28.     The parties settled this dispute in 1986 and, pursuant to the Settlement Agreement, Ms. Woodard's October 11, 1985 player's contract is no longer in force or effect.

29.     Ms. Woodard then signed another contract with the Harlem Globetrotters in

MONTH 1986 ("1986 Contract").

30.     Under the terms of the 1986 Contract, Ms. Woodward was paid a salary of only $75,000. A true and correct copy of the 1986 Contract is attached hereto as **Exhibit B**.

31.     This contract covers the 1986-87 season. *Id*.

32.     This contract contains a California choice of law provision.

33.     The contracts contain a provision which purportedly grants the right to use Ms. Woodard's name, image, and likeness in perpetuity to HGI.

34.     The contract does not provide separate consideration for this purported grant to Ms. Woodard's name, image, and likeness in perpetuity.

35.     HGI's position is that the annual salary of $75,000 paid to Ms. Woodard can be used as consideration for their right to Ms. Woodard's name, image, and likeness for time and all eternity, but this is not how consideration works.

36.     This is not the first time the Globetrotters have been accused of violating or found to have violated the terms of its players.

**B.     Collective Bargaining Agreement**

37.     Ms. Woodard was also party to a Collective Bargaining Agreement ("CBA") during her time on the Globetrotters team as a member of the players union.

38.     The United Basketball Players Association ("UBPA"), the players union organized to represent players for the Harlem Globetrotters, entered into several iterations of the Collective Bargaining Agreement with the Harlem Globetrotters.

39.     The 1983 CBA entered into between the UBPA and the Harlem Globetrotters was in effect during Ms. Woodard's time on the team.

40.     The term of the 1983 CBA was through August 31, 1986, with annual automatic renewals. *Id*. at Article 16.1.

41.     The CBA and the individual player's contracts are inextricably intertwined with one another, such that they must be read together.

42.     Under the applicable 1983 CBA, the Harlem Globetrotters agreed to pay royalties on merchandise sales to the players, and provided rights considered "minima" and supplemental to, and superseding, the individual players contracts.

43.     The CBA provides rights in excess of the individual employee contract.

44.     The CBA, among other things, guarantees royalties under Article 14.12 to players.

45.     That provision reads:

Notwithstanding the rights of the Company granted pursuant to an Employee's individual contract, the following shall apply with respect to the use of an Employee's name, nickname, signature facsimile, and identifiable portrait, picture, likeness or recorded voice, on articles of merchandise manufactured, or licensed for manufacture, by the Company, for sale to the public ("covered merchandise").

*See* 1983 Collective Bargaining Agreement. A true and correct copy of a relevant excerpt of the CBA is attached hereto as **Exhibit C**.

46.     Under the CBA, there are certain clear exclusions. For example, "covered merchandise" excludes "publications, yearbooks, signed photographs, items of the type sold at games, television and radio programs, films, and the like." CBA Article 14.12.

47.     The Lynette Hoodie and Lynette Sweatpant (collectively, "Lynette Sweatsuit") are not the type of items that would be excluded from "covered merchandise" under the CBA.

48.     This Article also requires the Company, on March 31 of each year, to compute and determine the net revenues it has received during the previous one-year period of "covered merchandise" after deductions for licensing fees and attendant expenses ("net merchandising

revenues"). Under each individual merchandising agreement if the net merchandising revenues in any year exceed $5,000.00 the Employees shall be paid 25% of the net merchandising revenues from each individual merchandising agreement. *Id*.

49.     The royalty rate is clear: "Employees shall … be paid twenty-five percent (25%) of such 'net merchandising revenues.'" *Id*.

50.     HGI has made no effort to comply with the reporting requirements in the Collective Bargaining Agreement which is a violation of Ms. Woodard's player's contract.

**III.    HGI did not assume Ms. Woodard's player contract out of the Chapter 11 bankruptcy proceedings.**

51.     At the time Ms. Woodard signed her 1985 Contract, HGI was owned by Metromedia.

52.     Shortly thereafter, on or around March 1986, Metromedia sold the Globetrotters and Ice Capades to International Broadcasting Company ("IBC").

53.     On August 30, 1991, IBC filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota. *In re Int'l Broad. Corp.*, No. 91-5999-RJK (Bankr. Minn. 1991).

54.      In March 1993, out of the Chapter 11 proceedings, IBC sold HGI to a former player, Mannie Jackson.

55.     Ms. Woodard's 1985 and 1986 player contracts were executory at the time HGI was purchased out of the bankruptcy, which means that the parties' obligations remained largely unperformed.

56.     Specifically, Ms. Woodard's player contracts and the collective bargaining agreement required HGI and the Globetrotters to perform and honor its continuing duty to account for any pay royalties for the use of Ms. Woodard's name, image, and likeness.

57.     The publicity provisions in Ms. Woodard's player contracts and the collective bargaining agreement purportedly allowing the use of Ms. Woodard's name, image, and likeness in perpetuity go to the essence of the contract.

58.     HGI and the Globetrotters failed to account for and pay royalties to Ms. Woodard for the use of her name, image, and likeness.

59.     Upon information and belief based on a good faith investigation, HGI failed to take sufficient steps to assume Ms. Woodard's player contracts when it was purchased by Mannie Jackson out of the IBG Chapter 11 bankruptcy proceedings.

60.     As a result of not assuming the contract out of the Chapter 11 bankruptcy proceedings, HGI is unable to enforce the contract against Ms. Woodard.

**IV.     The Partnership Between UNDRCRWN and the Harlem Globetrotters.**

61.     The Harlem Globetrotters entered into a Merchandising Agreement with UNDRCRWN with a term beginning on December 1, 2021.

62.     The partnership between UNDRCRWN and the Harlem Globetrotters was launched on or about April 27, 2022. *See* The Harlem Globetrotters, *UNDRCRWN Teams Up With Harlem Globetrotters For Ultimate Collection* (Apr. 27, 2022), *available at* https://www. harlemglobetrotters.com/news/undrcrwn/ (last visited May 6, 2025), attached hereto as **Exhibit D**; Snobette, *First Look At UNDRCRWN And Harlem Globe Trotters'* (sic) *Capsule Collection* (Apr. 26, 2022), *available at* https://snobette.com/2022/04/undrcrwn-harlem-globe-trotters-lynette-woodard-collection/#google_vignette (last visited May 6, 2025), attached hereto as **Exhibit E**.

63.     Among the items that this partnership produced and sold in commerce via the internet and other channels of distribution to be determined was "[t]he 'Lynette' fleece sweatsuit

[which] is named in honor of Lynette Woodard, the first female member of the Harlem

Globetrotters (1985), whose breakthrough participation made the Globetrotters the first co-ed

professional team." *See* The Harlem Globetrotters, UNDRCRWN Teams Up With Harlem

Globetrotters For Ultimate Collection (Apr. 27, 2022), *available at* https://www.

harlemglobetrotters.com/news/undrcrwn/ (last visited May 6, 2025), attached hereto as

**Exhibit F**.

      64.    By their own account, Respondents named the "Lynette" fleece sweatsuit after

Ms. Woodard to take advantage of Ms. Woodard's iconic status as the first woman Harlem

Globetrotter and to falsely imply that she endorsed products being sold. For example, the

"creative director and entrepreneur behind UNDRCRWN," Kari Cruz, stated: "I am truly

honored to represent women in sports and design with this collection. And I'm grateful to build

upon the legacy of the Globetrotter brand by telling women's stories, like Lynette's, in the

process." *Id*.

      65.    The "Lynette" fleece sweatsuit, consisting of sweatpants and a hoodie, are

indisputably a "good or service" and by associating her name directly with these items,

Defendants have caused consumer confusion.

      66.    Ms. Woodard never gave permission to Defendants to use her name or persona.

      67.    The use of Ms. Woodard's name and persona was not necessary to describe

Respondents' products.

      68.    The quality of the products has no relevance to Ms. Woodard's claims.

      69.    According to the Internet Archive (commonly referred to as the "Wayback

Machine"), the Lynette Sweatpant and Lynette Hoodie remained on sale to the general public

through at least May 18, 2024.



*See* Internet Archive, UNDRCRWN, UNDRCRWN® x HARLEM GLOBETROTTERS (May 18, 2024), *available at* https://web.archive.org/web/20240518062312/https://undrcrwn.com/ (last visited May 6, 2025), attached hereto as **Exhibit G**.

70.    Ms. Woodard has never received any compensation for the use of her name on the Lynette hoodie and/or Lynette sweatpant.

71.    Ms. Woodard has never received any report detailing how many units of the Lynette hoodie and/or Lynette sweatpant were sold.

72.    While Defendants have apparently discontinued sales of the "Lynette" products, an unknown quantity have been sold as they remain available to the public via the secondary market:



See eBay, UNDRCRWN x Harlem Globetrotters Lynette Hoodie Unisex Medium Ombre Tie Dye Blu, attached hereto as **Exhibit H**. *See also* Grailed, UNDRCRWN x Harlem Globetrotters Lynette Hoodie Unisex Medium, *available at* https://www.grailed.com/listings/68694488-undrcrwn-undrcrwn-x-harlem-globetrotters-lynette-hoodie-unisex-medium (expired listing) (last visited May 6, 2025).

73.     While Defendants have apparently discontinued sales of the "Lynette" products, the Lynette sweatsuit is still pictured on the UNDRCRWN website:



*See* UNDRCRWN, Harlem Globetrotters x UNDRCRWN, *available at* https://undrcrwn.com/collections/harlem-globetrotters-x-undrcrwn (last visited May 6, 2025), attached hereto as **Exhibit I**.

74.    Moreover, Defendants have touted that NBA player Kyle Thompson was spotted in a "Lynette" hoodie:



*See* UNDRCRWN, Spotted: Klay Thompson Wearing The "Lynette" Hoodie (Jan. 19, 2022), *available at* https://undrcrwn.com/blogs/news/spotted-klay-thompson-wearing-the-lynette-hoodie (last visited May 6, 2025), attached hereto as **Exhibit J**.

<u>**Causes of Action**</u>

**Count I:**
**Declaratory Judgment Declaring Player Contracts a Legal Nullity**

75.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 74 of her Complaint as if fully set forth herein.

76.    As demonstrated above, at the time Ms. Woodard signed her 1985 Contract, HGI was owned by Metromedia. Shortly thereafter, on or around March 1986, Metromedia sold the Globetrotters and Ice Capades to International Broadcasting Company ("IBC").

77.    On August 30, 1991, IBC filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota. *In re Int'l Broad. Corp.*, No. 91-5999-RJK (Bankr. Minn. 1991). In March 1993, out of the Chapter 11 proceedings, IBC sold HGI to a former player, Mannie Jackson.

78.    Upon information and belief based on a good faith investigation, HGI did not assume the Ms. Woodard's player contracts when it was purchased by Mannie Jackson out of the IBG Chapter 11 bankruptcy proceedings.

79.    Ms. Woodard's 1985 and 1986 player contracts were executory at the time HGI was purchased out of the bankruptcy. Specifically, Ms. Woodard's player contracts and the collective bargaining agreement required HGI and the Globetrotters to perform and honor its continuing duty to account for any pay royalties for the use of Ms. Woodard's name, image, and likeness.

80.    The publicity provisions in Ms. Woodard's player contracts and the collective bargaining agreement purportedly allowing the use of Woodard's name, image, and likeness in perpetuity go to the essence of the contract. HGI and the Globetrotters failed to account for and pay royalties to Woodard for the use of her name, image, and likeness.

81.    Because HGI did not assume Ms. Woodard's executory player contracts out of the Chapter 11 bankruptcy proceedings, it is unable to enforce them against her here.

82.    Ms. Woodard is entitled to a declaration that her player contracts are a legal nullity because they were not assumed by HGI in the Chapter 11 proceedings.

**Count II:**
**Federal Unfair Competition/False Designation of Origin and Misappropriation**

83.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 74 of her Complaint as if fully set forth herein.

84.    This claim arises under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

85.    In or about 2021, Defendants commenced the manufacture, promotion, sale, and distribution of a clothing line bearing and in connection with Plaintiff's name, image, and likeness, which products have been marketed, offered for sale, and sold in interstate commerce in the United States.

86.    Plaintiff has not approved or authorized the Defendants' activities.

87.    Defendants' commercial use of Plaintiff's name in connection with the marketing, sale, and distribution of its products bearing Plaintiff's name misrepresents and falsely suggests to the general public and the basketball community that Ms. Woodard has endorsed or is otherwise affiliated with the Lynette Sweatsuit, and creates a likelihood of confusion by consumers and the basketball community as to Plaintiff's sponsorship and endorsement of the products.

88.    Defendants unauthorized use of the name, image, or likeness or Ms. Woodard, as set forth above, violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

89.    As a direct and proximate result of the Defendants' violations of the Lanham Act, Ms. Woodard has suffered actual damages in an amount to be proven at trial.

90.    Ms. Woodard is entitled to damages and Defendants' profits, treble damages, and attorney's fees pursuant to 15 U.S.C. § 1117.

91.    However, Plaintiff has no adequate remedy at law to compensate her fully for damages that have been caused by Defendants' unlawful acts and which would be caused by any

further infringement of Plaintiff's name, image, or likeness by Defendant unless future unlawful acts and infringements of this kind are enjoined by this Court.

92.    Indeed, unless Defendants are permanently enjoined from such activity in the future, the public and the Basketball community will come to associate Plaintiff's name only with the Defendants.

**Count III:**
**False Endorsement**

93.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 74 of her Complaint as if fully set forth herein.

94.    This claim arises under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

95.    In or about 2021, Defendants commenced the manufacture, promotion, sale, and distribution of a clothing line bearing and in connection with Plaintiff's name, image, and likeness, which products have been marketed, offered for sale, and sold in interstate commerce in the United States.

96.    Plaintiff has not approved or authorized the Defendants' activities.

97.    Defendants' commercial use of Plaintiff's name in connection with the marketing, sale, and distribution of its products bearing Plaintiff's name misrepresents and falsely suggests to the general public and the basketball community that Ms. Woodard has endorsed or is otherwise affiliated with the Lynette Sweatsuit, and creates a likelihood of confusion by consumers and the basketball community as to Plaintiff's sponsorship and endorsement of the products.

98.    Defendants unauthorized use of Plaintiff's name, image, or likeness as set forth above, violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

99.    As a direct and proximate result of the Defendants' violations of the Lanham Act, Ms. Woodard has suffered actual damages in an amount to be proven at trial.

100.    Ms. Woodard is entitled to damages and Defendants' profits, treble damages, and attorney's fees pursuant to 15 U.S.C. § 1117.

101.    However, Plaintiff has no adequate remedy at law to compensate her fully for damages that have been caused by Defendants' unlawful acts, and which would be caused by any further infringement of Plaintiff's name, image, or likeness by Defendant unless future unlawful acts and infringements of this kind are enjoined by this Court.

102.    Indeed, unless Defendants are permanently enjoined from such activity, the public and the Basketball community will come to associate Plaintiff's name only with the Defendants. It is impossible to quantify the immense damage this has done and will continue to do to Plaintiff's reputation.

## Count IV:
## New York Unfair Competition

103.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 74 of her Complaint as if fully set forth herein.

104.    Through her career, Woodard has built up valuable goodwill in her name, image, and likeness.

105.    Defendants' knowing, willful, and unauthorized use of her name, image, and/or likeness in connection with the "Lynette Sweatsuit" was to the detriment of Woodard and has enriched the Defendants.

106.    Defendants have traded on the goodwill associated with Woodard's name and have misled the public and the trade into assuming Woodard has approved or otherwise endorsed the "Lynette Sweatsuit."

107.    Defendants' conduct was done knowingly, willfully, and/or in grossly reckless disregard for Woodard's rights and for the purpose of trying to avoid having to pay the fair and contractual royalty rates for such use.

108.    Defendants have caused confusion, mislead and deceived the public and the trade as to the endorsement, approval, and/or sponsorship of Defendants' products in a manner that falsely suggests to the consuming public and to the trade that the "Lynette Sweatsuit" was approved, endorsed, or otherwise sponsored by Woodard in violation of the New York common law of unfair compensation.

109.    As a result of the Defendants' conduct, Plaintiff has suffered damages in an amount to be ascertained.

**Count V:**
**Violation of New York Civil Rights Law**

110.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 74 of her Complaint as if fully set forth herein.

111.    Defendants have used Plaintiff's name within the state of New York for advertising purposes or for the purposes of trade.

112.    Defendants' use of Plaintiff's name has been without the written or oral authorization of Plaintiff, or anyone authorized by her to give such authorization.

113.    Defendants' use of Plaintiff's name was willful, malicious, and in conscious disregard of Plaintiff's rights.

114.    Defendants' use of Plaintiff's name falsely implies that she endorsed or was associated with Defendant.

115.    Defendants' conduct is in direct violation of Plaintiff's rights under Sections 50 and 51 of the Civil Rights Law of the State of New York.

116.    As a result of Defendants' unauthorized use of Plaintiff's name, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial.

117.    Defendants have knowingly used Plaintiff's name in a manner that they knew to be forbidden and/or unlawful pursuant to Section 50 of the New York Civil Rights law.

118.    Defendants knew they were required to obtain Plaintiff's consent for this use of her name and persona.

119.    Indeed, the Globetrotter Defendants have been sued for conduct like this by several other former players including Meadowlark Lemon, Fred "Curly" Neal, Larry "Gator" Rivers, Dallas "Big D" Thronton, Robert "Showboat" Hall, Marques Haynes, and James "Twiggy" Sanders. *See Lemon v. Globetrotters*, No. CV-04-299-PHX-DGC, CV-04-1023-PHX-DGC (consolidated cases) (D. Ariz.).

120.    Defendants never sought Plaintiff's consent because they knew Plaintiff would not give it for free.

121.    Plaintiff therefore demands exemplary damages under Section 51 of the New York Civil Rights law.

## Count VI:
## California Common Law Commercial Misappropriation

122.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 74 of her Complaint as if fully set forth herein.

123.    Defendants used Plaintiff's name and likeness on and in connection with the sale of the "Lynette" Sweatsuit, resulting in commercial benefit to the Defendants.

124.    Plaintiff did not consent to this use.

125.    Defendants knew they had no right to use these publicity rights on the Lynette Sweatsuit.

19

126.    Defendants did not obtain consent from Plaintiff to use her publicity rights.

127.    Defendants' use of Plaintiff's name and likeness damages Plaintiff by diminishing Plaintiff's ability to control the value of her own brand. This harms her goodwill and future ability to generate earnings from her use of her name and likeness.

### Count VII:
### California's Statutory Right of Publicity

128.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 74 of her Complaint as if fully set forth herein.

129.    Defendants used Plaintiff's name and/or likeness on and in direct connection with the sale of the "Lynette" Sweatsuit, resulting in a commercial benefit to the Defendants.

130.    Plaintiff never consented to this use by Defendants.

131.    Defendants knew that they do not have the right to design, manufacture, distribute, and sell products bearing Lynette Woodard's name, image, or likeness.

132.    Defendants' use of Plaintiff's name and likeness damages Plaintiff by diminishing Plaintiff's ability to control the value of her own brand. This harms her goodwill and future ability to generate earnings from her use of her name and likeness.

### Count VIII:
### Common Law Unfair Competition

133.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 74 of her Complaint as if fully set forth herein.

134.    Defendants' activities as stated herein constitute unfair competition within the State of New York in violation of New York law.

135.    Defendants wrongfully misappropriated the commercial advantage of goodwill associated with the name of Ms. Woodard to compete against Plaintiff's own use of the same property.

136.    As a direct and proximate result of the Defendants' acts of unfair competition Plaintiff has suffered damages in an amount to be determined at trial.

137.    Defendants' acts of unfair competition were willful, malicious, and in conscious disregard of Plaintiff's rights. Plaintiff therefore demands punitive damages.

### Count IX:
### Common Law Invasion of the Right of Publicity

138.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 74 of her Complaint as if fully set forth herein.

139.    Plaintiff has the right to control the commercial use of her identity, personality, name, likeness, goodwill, and notoriety.

140.    The Defendants have used Plaintiff's identity, attributes of identity, name, persona, and likeness to their commercial advantage, without Plaintiff's consent or authority, and this use has resulted and will continue to result in Plaintiff being injured.

141.    As a direct and proximate result of the conduct of the Defendants set forth herein, Plaintiff has sustained and will continue to sustain damages.

### Count X:
### Unjust Enrichment

142.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 74 of her Complaint as if fully set forth herein.

143.    Defendants have been unjustly enriched by obtaining the pecuniary benefit of using the name, image, and/or likeness of a player of Ms. Woodard's caliber to create, market, sell, and distribute goods, without her knowledge or consent.

144.    Defendants have been enriched at Woodard's expense since she has not been compensated commensurate with the value of the benefit received by Defendants.

145.    It is against equity and good conscience to permit Defendants to retain the pecuniary benefit that resulted from the unauthorized use of Ms. Woodard's name, image, and/or likeness.

146.    As a result of the conduct of the Defendants, Plaintiff has suffered damages in an amount to be ascertained.

**Count XI:**
**The Provision of Woodard's Contract Purporting to Grant**
**HGI License to her Name, Image, and Likeness in Perpetuity is Invalid**

147.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 74 of her Complaint as if fully set forth herein.

148.    It is a basic principle of contract law that there must be consideration.

149.    An illusory contract is an agreement in which what "one party gives as consideration is so insubstantial as to impose no obligation is unenforceable." *WCA Holdings III, LLC v. Panasonic Avionics Corp.,* 704 F. Supp. 3d 473, 495 (S.D.N.Y. 2023) (internal citations omitted).

150.    Plaintiff was given no consideration in exchange for purportedly granting to HGI, in perpetuity, the right to use her name, image, and likeness.

151.    HGI promised nothing, and gave nothing, in exchange for this perpetual grant of power over Ms. Woodard's name, image, and likeness.

152.    This provision of the contract is therefore invalid and unenforceable.

**Count XII:**
**Breach of Contract**

153.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 74 of her Complaint as if fully set forth herein.

154.    If it is found that HGI did validly acquire Ms. Woodard's contract in the 1993 bankruptcy, which Woodard disputes, she pleads in the alternative that Defendant HGI is liable for breach of contract.

155.    Ms. Woodard and the Harlem Globetrotters were parties to both her individual player contracts and the 1983 Collective Bargaining Agreement.

156.    The CBA and the individual player's contracts are inextricably intertwined with one another, such that they must be read together.

157.    As explained herein, the applicable 1983 CBA, provided rights considered "minima" and supplemental to, and superseding, the individual players contracts.

158.    The CBA is clear that HGI owes her royalties for their use of her name, image, and/or likeness.

159.    HGI has failed to pay her a cent of royalties and thus are in breach of contract.

160.    As a result, Ms. Woodard has suffered damages in an amount yet to be fully ascertained.

**Count XIII:**
**Unconscionability**

161.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 74 of her Complaint as if fully set forth herein.

162.    It is both procedurally and substantively unconscionable to have an employee give up rights to her name forever, for no consideration, simply to sign an employment contract.

163.    It is undeniable that the Harlem Globetrotters had all of the power in the bargaining situation.

164.    Ms. Woodard, through the Harlem Globetrotters, was presented with the opportunity to be the first woman to ever play on a men's professional basketball.

165.    The gravity of this opportunity is hard to overstate.

166.    Because of this, Ms. Woodard had a clear absence of power in the negotiation of the terms of the contract.

167.    Indeed, Ms. Woodard believed there was no room for negotiation when she signed her contract.

168.    Moreover, there was no possible substitute in the market—Ms. Woodard could either play basketball with the Harlem Globetrotters, or she could not play on a men's professional team at all.

169.    Ms. Woodard could have hardly expected at the time of signing, that almost forty years after she signed this contract, HGI would be purportedly using this contract as a way to make money without paying her royalties.

170.    Ms. Woodard played for the Harlem Globetrotters for two seasons, and, HGI believes, they consequently own her name, image, and likeness forever under the employment contracts she signed.

## **Prayer for Relief**

**WHEREFORE**, Plaintiff demands a declaration and judgment against Defendant, and each of them, jointly and severally, as follows:

A.    A declaration finding that Ms. Woodard's 1985 and 1986 players contracts are void and enenforceable because they were not assumed by HGI in the Chapter 11 bankruptcy proceedings.

B.    Permanently enjoining and restraining Defendants, their respective officers, agents, servants, employees and attorneys, and predecessors and successors, by whatever name, and all those in active concert or participation with them from manufacturing, distributing,

advertising, promoting, holding out for sale and/or selling any products or services bearing or in connection with Plaintiff's name or likeness, or otherwise using same;

C.      Directing such other relief as the Court may deem appropriate to prevent the trade and public from deriving any erroneous impression that any products or services manufactured, distributed, offered for sale, sold or otherwise circulated or promoted by Defendants are authorized by Plaintiff.

D.      Directing that an accounting of and judgment be rendered against each Defendant for:

        1.      All profits received by any of the Defendants and all damages sustained by Plaintiff on account of Defendants' unfair competition; and furthermore, that such profits and damages as found herein be trebled, as provided by 15 U.S.C. § 1117; and

        2.      All profits received by any of the Defendants and all damages sustained by Plaintiff on account of Defendants' tortuous interference with Plaintiff's contractual and advantageous business relationships.

E.      Awarding Plaintiff punitive damages.

F.      Awarding Plaintiff her costs in this action, including reasonable attorneys' and investigative fees.

G.      Directing that the Court retains jurisdiction of this action for the purpose of enabling Plaintiff to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the interpretation or execution of any order entered in this action, for the modification of any such order, for the enforcement or compliance therewith, and for the punishment of any violations thereof.

H.  Awarding to Plaintiff such other and further relief as the Court may deem just and proper.

June 30, 2025                          Respectfully submitted,

                                      */s/ Michael L. Murphy*
                                      Michael L. Murphy, Esq.
                                      Elliott C. McGraw, Esq.
                                      1055 Thomas Jefferson Street NW
                                      Suite 540
                                      Washington, DC 20007
                                      mmurphy@baileyglasser.com
                                      emcgraw@baileyglasser.com

                                      Michael B. Clohisy, Esq.* (MA BBO 660102)
                                      7 Brockton Avenue
                                      Haverhill, MA 01830

                                      * counsel intends to seek admission pro hac vice